UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| LOUANN STECKEL, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) CAUSE NO.: 4:09-CV-63-TS |
| CENTRAL RESERVE LIFE INSURANCE COMPANY, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This is a lawsuit brought by an insured against her health insurance provider. The Plaintiff, LouAnn Steckel, claims that the Defendant, Central Reserve Life Insurance Company, was obligated under a contract of insurance to reimburse her for medical, surgical, and hospital expenses that she incurred for treatment of a tracheal tear and that it wrongfully denied coverage. The Defendant maintains that it rightfully denied coverage because the Plaintiff's hospitalization and treatment resulted from conditions caused by an overdose of a controlled substance, for which she did not have a prescription, that the Plaintiff altered from its original form and voluntarily injected into her body. The matter comes before the Court on cross motions for summary judgment.

**BACKGROUND**

On July 20, 2009, the Plaintiff filed a Complaint for Damages against the Defendant in Tippecanoe Superior Court alleging that the Defendant wrongfully denied her insurance coverage and demanding judgment in an amount equal to all of her medical, hospital, and surgical expenses plus interest accrued, prejudgment interest, exemplary damages, and attorney's

fees. On September 3, the Defendant filed an Answer and shortly thereafter, removed the matter to this federal court on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332(a) & 1441(a).

On February 26, 2010, the Plaintiff moved to amend her complaint, stating that the Defendant had suggested that the Employee Retirement Income Security Act (ERISA) may govern the case, and that she wanted to add a paragraph to address the potential impact of ERISA. The Court granted the Plaintiff's request, and on May 3, the Plaintiff filed her Amended Complaint for Damages, reasserting the claims from her first Complaint and adding that, to the extent that the insurance policy was an ERISA plan, she was demanding relief in the form of an injunction requiring the Defendant to pay the medical claims pursuant to the plan and for all other appropriate equitable relief. The Plaintiff also requested attorney's fees and costs "in connection with defendant's culpability and bad faith of unjustly refusing to pay the claims." (Am. Compl. ¶ 8, ECF No. 14.)

On May 14, the Plaintiff filed her Motion for Partial Summary Judgment & Designation of Materials [ECF No. 15] and Brief in Support [ECF No. 16]. The Plaintiff submitted evidentiary materials with her Motion. The Plaintiff contends that there are no disputed issues of material fact and that the Defendant should be required to provide benefits to the Plaintiff as a matter of law. The Plaintiff's Motion seeks only partial summary judgment because it does not undertake to resolve the issue of prejudgment interest, attorney's fees, or other damages. On this same date, the Defendant filed its Motion for Summary Judgment [ECF No. 17], Brief in Support [ECF No. 18], and Appendix [ECF No. 19]. The Defendant seeks judgment in its favor on the issue of insurance coverage and an award of attorney's fees and costs. The parties have also filed response and reply briefs in support of their respective positions. Also, on May 27, the

Defendant filed an Answer to the Amended Complaint for Damages.

**STATEMENT OF FACTS**

The Plaintiff, a resident of West Lafayette, Indiana, is a registered nurse with more than thirty years of experience working in the nursing field. In March 2008, she became unemployed. In addition to being without work, the Plaintiff was caring for her ailing father, who was in hospice after being diagnosed with terminal cancer. In April, the Plaintiff was not sleeping well and was suffering from migraine headaches, which she described as severe, painful, and sometimes debilitating. The Plaintiff also believed that she was depressed and anxious. The Plaintiff did not have a family doctor because she was in the process of trying to find a new doctor. Although she had a prescription for Ambien from her previous doctor, it did not help her sleep. By the second week in April, the Plaintiff was averaging only two hours of sleep per night, which affected her ability to perform tasks, make decisions, and otherwise function.

As a caretaker of her father, the Plaintiff had access to his medications, including Fentanyl patches that were intended to be adhered to the skin to treat pain. According to the Food and Drug Administration (FDA), the Fentanyl skin patch contains the opioid Fentanyl, a potent narcotic. The FDA approved the patch in 1990 to treat patients with moderate to severe chronic pain and is most commonly prescribed for people with cancer. U.S. Food and Drug Administration Consumer Update, Posted Dec. 21, 2007, http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm100223.htm.

On April 14, 2008, the Plaintiff was unable to fall asleep and decided to use Fentanyl that she had obtained from her father's medical supply as a sedative to help her sleep. She had used

this same method to fall asleep on the previous night. The Plaintiff contends that she was familiar with Fentanyl and using syringes in her capacity as a nurse. The Plaintiff converted the Fentanyl gel inside the patch into a liquid and used a syringe to inject the drug into her body. The Plaintiff reacted to the injected Fentanyl by going into respiratory failure. Her roommate heard a thud in the upstairs bathroom, found the Plaintiff unresponsive, and called emergency medical services (EMS). EMS performed an emergency intubation on site. The Plaintiff began to wake up as EMS transferred her down the stairs, and she suffered an iatrogenic tracheal tear that required major surgery and additional medical and hospital care. The Plaintiff's medical bills related to the April 18 incident totaled around $100,000.

On April 14, 2008, the Plaintiff was insured through her previous employer under the terms and conditions of Group Insurance Policy I-1024 (the Policy), which included coverage for major medical expenses. The Policy had been issued to International Professional Group Incorporated. Central Reserve Life Insurance Company, the company that issued the Policy, is incorporated in Ohio. In 1998, the Defendant submitted the Policy to the Indiana Department of Insurance for review and approval as a policy that had been issued to an out-of-state trust domiciled in Ohio and approved by the domiciliary State of Ohio.

The Plaintiff submitted to the Defendant for reimbursement her claims for medical and hospital bills incurred as a result of the April 14 incident.[1] The Defendant denied each of the

---

[1] Although the Plaintiff was no longer employed as of March 2008, she continued to pay for and receive coverage pursuant to her election under the Policy and COBRA (Consolidated Omnibus Budget Reconciliation Act). The Policy provided that when coverage was lost upon the occurrence of a qualifying event, an "Insured Person may continue the same group health coverage as provided for the other Insured Persons covered under the group plan." (Policy 52, ECF No. 19-5.) In her Brief in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, the Plaintiff asserts that the Defendant has not "provided the facts establishing the state of Plaintiff's insurance coverage once it was taken into COBRA coverage." (Brief 2, ECF No. 26.) The Plaintiff does not indicate how coverage may have changed after her election under COBRA or designate any evidence or point to any terms that were actually different. All of the parties' arguments assume that coverage under the Policy remained

4

Plaintiff's claims for reimbursement. During the claims review process, the Defendant relied on General Exclusion No. 36, which precludes coverage for charges "[r]esulting from any suicide, attempted suicide or intentionally self-inflicted Injury or Sickness, unless resulting from an act of domestic violence or a covered medical condition, including Mental Illness." (Policy 28, ECF No. 19-5.) Although the Defendant agreed that the Plaintiff had not attempted to commit suicide, it maintained that Exclusion No. 36 applied because she was treated for illness caused by altering a Fentanyl patch and intentionally injecting the drug with a syringe, which was an intentionally self-inflicted injury. The Defendant asserted that Exclusion Nos. 35 and 44 are also pertinent to the Plaintiff's claims. Exclusion 35 excludes coverage for "Treatment of controlled (as defined by the Federal Food and Drug Administration) or prohibited substances abuse, including any conditions caused by, or related in any manner to, such abuse." (Policy 28.) Exclusion 44 applies to illness resulting from the insured person's intoxication or being under the influence of controlled substances. (Policy 29.) The Defendant also informed the Plaintiff that other exclusionary provisions might apply to the denial of her claim and that it was not waiving any of its rights under the Policy.

After the Plaintiff initiated this lawsuit, the Defendant identified two additional Policy exclusions that might apply, Exclusion Nos. 42 and 45. Exclusion No. 42 denies coverage "[f]or the Treatment of complications arising from or connected in any way with a surgical or medical Treatment or procedure that is not a covered surgical or medical Treatment or procedure under the terms of the Policy." (Policy 29.) In Exclusion No. 45, "Illness that results either directly or indirectly from the Insured Person's committing or attempting to commit or participation in a

---

unchanged after the Plaintiff's employment ended.

felony" is excluded from coverage. (Policy 29.)

## ANALYSIS

The Plaintiff claims that she was a named insured of a medical insurance policy issued by the Defendant and maintained by her previous employer and that the Defendant wrongfully denied her benefits when it refused to reimburse her for medical, hospital, and surgical expenses that she incurred. The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When cross motions for summary judgment are filed, the court looks to the burden of proof that each party would bear on an issue and then requires that party to go beyond the pleading and affirmatively establish a genuine issue of material fact. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). For claims seeking benefits under an ERISA plan, the plaintiff would bear the burden of proof at trial of establishing her entitlement to benefits, and the defendant would bear the burden of proving the plaintiff's lack of entitlement. *Id.*

A plan that an employer maintains for the purpose of providing for its participants or their beneficiaries "medical, surgical, or hospital care or benefits" is an "employee welfare benefit plan." 29 U.S.C. § 1002(1). An "employee welfare benefit plan" is an "employee benefit plan" for purposes of ERISA. *Id.* § 1002(3); *see also Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 537 (7th Cir. 2000) (setting forth the elements of a welfare plan governed by ERISA). Section 502(a) of ERISA contemplates civil actions by plan participants or beneficiaries to recover benefits due under the terms of the plan, to enforce rights under the terms of the plan, or

to clarify rights under the terms of the plan. 29 U.S.C. § 1132(a)(1). When a claim is within the scope of § 502, all other claims are completely preempted, no matter how they are characterized. *Klassy v. Physicians Plus Ins. Co.*, 371 F.3d 952, 954 (7th Cir. 2004). In an ERISA case, the "judiciary makes an independent decision about benefits" unless the plan "confers interpretive or operations discretion on its administrator." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 842 (7th Cir. 2009); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

In its briefing, the Defendant argues that the Plaintiff's state law claims are preempted by ERISA, and the Plaintiff, although not explicitly stating as much in her briefing, abandons her state law claims. Accordingly, the Defendant's motion for summary judgment will be granted on these claims. With regard to the ERISA claim, the parties agree that the de novo standard of review applies in this case. *See Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005) (stating that a district court reviews de novo a denial of benefits unless the plan grants to the plan administrator the discretionary authority to construe policy terms). This means that it is the responsibility of the Court to come to an independent decision on the legal and factual issues, regardless of what happened before the plan administrator. *See Diaz*, 499 F.3d at 643 (stating that "[w]hat happened before the Plan administrator or ERISA fiduciary is irrelevant" when de novo consideration is applied in an ERISA case because the court is not actually *reviewing* anything). In construing the terms of the plan, the Court employs federal common law rules of contract interpretation, which requires interpreting terms in an ordinary and popular sense, as a person of average intelligence and experience would interpret them. *Id.* at 644 (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). If a term is ambiguous because it is subject to more than one reasonable interpretation, the ambiguity will be construed

in favor of the insured. *Id.*

The Defendant submits that the Plaintiff's claim is excluded from coverage under four different Policy Exclusions—Nos. 35, 36, 42, and 45. The Plaintiff argues that none of these Exclusions offers a valid excuse for the Defendant to deny health insurance benefits to the Plaintiff.

**A.      Exclusion Nos. 35, 42, and 45**

The Defendant argues that the Plaintiff's injuries and her corresponding medical bills resulted from her abuse of a Schedule II controlled substance—Fentanyl—and that Exclusion No. 35, which precludes coverage "[f]or Treatment of controlled (as defined by the Federal Food and Drug Administration) or prohibited substance abuse, including any conditions caused by, or related in any manner to, such abuse," therefore applies. The Defendant also asserts that Exclusion No. 45, which precludes coverage for "Illness that results either directly or indirectly from the Insured Person's committing or attempting to commit or participation in a felony" also applies to exclude coverage for the Plaintiff's injuries because her possession of Fentanyl without a prescription was a Class D felony in Indiana, and her injuries resulted directly or indirectly from her criminal acts. The Defendant maintains that Exclusion No. 42 applies to the treatment of the Plaintiff's ruptured trachea because it was a complication that arose from or was connected to a non-covered treatment or procedure.

The Plaintiff argues that all of these exclusions are invalid because they run afoul of Indiana Code § 27-8-5-3(b), which regulates the provisions that may be contained in accident and sickness insurance policies, including health insurance policies, that are "delivered or issued

for delivery to any person in [Indiana]." Subsection (b) lists the types of provisions that may not be included in a policy unless they are worded the same way as the statute or if they are more favorable to the insured and have been approved by the insurance commissioner of Indiana. The policy of a foreign insurer that is "delivered or issued for delivery to any person in [Indiana], may contain any provision which is not less favorable to the insured or the beneficiary than is provided in this chapter and which is prescribed or required by the law of the state under which the insurer is organized." Ind. Code § 27-8-5-3(f)(1). According to the statute, a provision related to "intoxicants and narcotics" must be worded as follows: "The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of any narcotic unless administered on the advice of a physician." Ind. Code § 27-8-5-3(b)(10). However, the statute explicitly prohibits this type of exclusion "with respect to a policy that provides coverage for hospital, medical, or surgical expenses." *Id.*

The Defendant argues that the restrictions set forth in § 27-8-5-3 do not apply to the Policy in this case because the statute only applies to policies that are "delivered or issued for delivery to any person in Indiana," Ind. Code § 27-8-5-3(b), and the Policy here does not qualify. The Defendant presents the Affidavit of Patricia Corrigan, an employee of a company that administers portions of the Defendant's business that were purchased by American Republic Insurance Company. She states that American Republic acquired the portion of the Defendant's business that insured the Policy. Corrigan avers that on June 11, 1998, the Defendant submitted the Policy to the Indiana Department of Insurance for informational purposes because it was issued to an out-of-state trust that was domiciled in Ohio. The letter submitting the Policy, which is attached to the Affidavit, states that the policy was filed and approved by the domiciliary State

9

of Ohio, as well as having been approved for use in sixteen other states.

The Defendant submits that a separate section of the Indiana Code, § 27-8-5-16.5, entitled "Conditions for issuance of certificate to resident of Indiana pursuant to group policy delivered or issued in another state," applies to the Policy. The Plaintiff, an Indiana resident, received a Certificate of Coverage. (Certificate, ECF Nos. 15-2 & 19-4.) Section 27-8-5-16.5 generally prohibits a certificate from being issued to a resident of Indiana pursuant to a group policy that is delivered or issued for delivery in a state other than Indiana. However, a certificate for such a policy may be issued if the legal requirements set forth in the statute are satisfied. Ind. Code § 27-8-5-16.5(d).[2] This code section identifies numerous Indiana statutes that out-of-state

---

[2] A certificate may be issued to an Indiana resident under a trust group policy issued by another state if:
(1) the delivery state has a law substantially similar to section 16 of this chapter;
(2) the delivery state has approved the group policy; and
(3) the policy or the certificate contains provisions that are:
    (A) substantially similar to the provisions required by:
        (i) section 19 of this chapter or, if the policy or certificate is described in section 2.5(b)(2) of this chapter, section 2.5 of this chapter;
        (ii) section 19.2 of this chapter if the policy or certificate contains a waiver of coverage;
        (iii) section 21 of this chapter; and
        (iv) IC 27-8-5.6; and
    (B) consistent with the requirements set forth in:
    (i) section 15.6 of this chapter;
    (ii) section 24 of this chapter;
    (iii) section 26 of this chapter;
    (iv) IC 27-8-6;
    (v) IC 27-8-14;
    (vi) IC 27-8-14.1;
    (vii) IC 27-8-14.5;
    (viii) IC 27-8-14.7;
    (ix) IC 27-8-14.8;
    (x) IC 27-8-20;
    (xi) IC 27-8-23;
    (xii) IC 27-8-24.3;
    (xiii) IC 27-8-26;
    (xiv) IC 27-8-28;
    (xv) IC 27-8-29;
    (xvi) 760 IAC 1-38.1; and
    (xvii) 760 IAC 1-39.
Ind. Code § 27-8-5-16.5(d).

policies must comport with (including other sections of chapter 5) before a certificate of insurance can be issued to an Indiana resident, but it does not incorporate § 27-8-5-3 or otherwise require that the policy of insurance meet the requirements of that section.

The Plaintiff does not dispute that the Policy was issued in Ohio or argue that Ind. Code § 27-8-5-16.5(c) incorporates § 27-8-5-3. The only response she offers to the Defendant's argument that the restrictions in § 27-8-5-3 do not apply because the policy was not issued to any person in Indiana is that the Defendant has already admitted in the course of this litigation that Indiana Code § 27-8-5-3(b)(10) applies to its Policy. The basis for the Plaintiff's argument is a footnote contained in the Defendant's Brief in Support of Summary Judgment in which the Defendant states: "In this lawsuit, [the Defendant] is not relying on and does not suggest that the Court ought to rely on Exclusion No. 44 as a basis for excluding coverage for Plaintiff's claims. *See* I.C. 27-8-5-3(b)(10)." (Def.'s Br. 5 n.1, ECF No. 18.) Exclusion No. 44, which the Defendant identified in some of its communications with the Plaintiff regarding the denial of her claims, precludes coverage for conditions resulting directly or indirectly from the insured's intoxication or being under the influence of a controlled substance. The Plaintiff asserts that the Defendant has thereby admitted "that it cannot have an exclusion of injuries on the basis that such injuries resulted either directly or indirectly from Plaintiff being under the influence of a controlled substance." (Pl.'s Reply 4, DE 28.) The Plaintiff argues that because the Plaintiff's injuries were the direct and indirect result of being under the influence of Fentanyl, no other exclusions can be used to deny coverage. She submits that the Defendant's citation to her felonious possession of a controlled substance as a reason to deny coverage is an improper attempt to get around its admission regarding Exclusion No. 44 involving the influence of a

11

controlled substance because one can never be under the influence of a controlled substance without first possessing it, and it was not mere possession that caused her injuries.[3] Thus, the exclusion for commission of a felony is, the Plaintiff argues, just another way of attempting to apply an exclusion that the Defendant already admitted is invalid. She argues that Exclusion No. 35, a separate exclusion, for abusing a controlled substance is likewise barred by the Defendant's so-called admission because whenever a person is under the influence of a non-prescribed controlled substance, it is considered an abuse of that substance. In response to the Plaintiff's claim that the Defendant admitted the application of Indiana Code § 27-8-5-3(b)(10) to bar Exclusion No. 44, the Defendant explains that, out of an abundance of caution, it is not relying on Exclusion No. 44 as a basis for denying the Plaintiff's claims and that it need not do so because multiple other exclusions apply.

Whether and to what extent Indiana Code § 27-8-5-3 applies to the Defendant's Policy is a legal determination, not an issue of fact. The undisputed facts are that the Policy was issued to an out-of-state trust domiciled in Ohio and that it was submitted to the Indiana Department of Insurance as such. Thus, Indiana Code § 27-8-5-3 requires that the Policy provisions may not be less favorable than those contained in the statute. Ind. Code § 27-8-5-3(f)(1). The Defendant does not rely on Exclusion No. 44, and the Court will not address it. With regard to General Exclusion Nos. 35, 42, and 45, the question before the Court is whether any of these Exclusions, when interpreted in an ordinary and popular sense as a person of average intelligence and experience would interpret them, applies to the facts of this case and is not less favorable than

---

[3] The Court notes that the record does not indicate that the Plaintiff was charged with, or convicted of, any crime related to her possession of Fentanyl.

provisions found in § 27-8-5-3(b).

It is undisputed that the Plaintiff possessed Fentanyl for which she did not have a prescription and that she altered the medication from its intended delivery form and injected it into her body in an effort to experience sedative effects. The Court finds that Exclusion No. 35 excluding coverage for the treatment of controlled substance abuse, including any conditions caused by or related in any manner to such abuse, applies to the circumstances of this case. "Treatment" is defined in the Policy as "[a]ny and all forms of care, including, but not limited to, medical care or surgical care; advice; consultation; equipment; devices; diagnosis; cure; mitigation or prevention of disease; drugs (prescribed or not-prescribed); examination; observation; services; supplies; or testing." (Policy 36, ECF No. 15-2.) Fentanyl is a Schedule II controlled substance under the Controlled Substances Act, 21 U.S.C. § 812. Drugs are categorized by, among other factors, their "potential for abuse," with Schedule II drugs having "a high potential for abuse." 21 U.S.C. § 812(b)(2). The Plaintiff's respiratory failure and non-responsive condition were caused by her injection of this controlled substance into her blood stream. Responding and attending medical staff treated the Plaintiff's condition as an "overdose" of Fentanyl. The product was not intended to be used as an injection, but as a patch placed on the skin to slowly release the drug into the body over a three-day period of time.[4] The Plaintiff did not have a prescription for Fentanyl. In addition, although drowsiness is one of the potential side effects of Fentanyl, the management of persistent pain is the intended use of the drug.

The FDA has warned that the improper use of Fentanyl patches has the potential to create

---

[4] Information about Fentanyl and Fentanyl patches, including product labels and warnings, is widely available on the Internet at websites maintained by the FDA and other government and medical sources. The Court does not include a citation to each source that it has consulted.

13

life-threatening consequences. The boxed warning label on the Duragesic product (the brand name of a Fentanyl patch product) indicates that it is among those drugs with the highest potential for abuse and associated risk of fatal overdose due to respiratory depression, that it is subject to abuse and to criminal diversion, and that the high drug concentration in the patches may be a particular target for abuse and diversion. The warning states that the product should only be used by patients who are already receiving opioid therapy and have demonstrated opioid tolerance and that the patches are intended for transdermal use (on intact skin) only. The product label warns that using a cut or damaged patch can lead to rapid release of the contents and absorption of a potentially fatal dose of Fentanyl. The label also identifies reports of the product's abuse by other methods and routes of administration that result in uncontrolled delivery of the opioid and pose a significant risk to the abuser that could result in overdose and death. The United States Department of Justice, Office of Diversion Control, reports that patches are abused when persons remove the gel contents from the patches and then inject or ingest the contents. *See also United States v. Krieger*, — F.3d —, No. 09-1333, 2010 WL 4941979, at *1 (7th Cir. Dec. 7, 2010) (noting that the Duragesic patch delivers a powerful opioid across the skin in small steady doses over the course of several days and "is not meant to be ingested orally nor injected under the skin, but is sometimes by those who are abusing the drug"). The Food and Drug Administration has issued two warnings for Fentanyl adhesive patches, one in 2005 and another in late 2007, to emphasize that the directions on the product label for the patch product should be followed exactly to avoid fatal overdoses.

    A person of average intelligence and experience applying the ordinary and popular sense of what it means to abuse a controlled substance would find that the Plaintiff's alteration and

self-injection of Fentanyl was not sanctioned and proper and that her use was improper and may be characterized as abuse of a controlled substance under the Policy. In addition, this abuse directly caused the conditions that required the emergency medical treatment that the Plaintiff received. The tracheal tear was also related to her abuse of Fentanyl and a complication that arose from and in connection with treatment not covered under the terms of the Policy. (Exclusion No. 42, Policy 29.) All of the Plaintiff's arguments against the application of Exclusion No. 35 are dependent on the Court finding that Indiana Code § 27-8-5-3(b) bars the Exclusion. The Court finds that Exclusion No. 35 is distinct from one that excludes coverage for loss sustained as a consequence of the insured being intoxicated or under the influence of a narcotic not administered by a physician. *See* Ind. Code § 27-8-5-3(b)(10). Subsection (b)(10) of this Indiana statute does not provide the proper comparison. Exclusion No. 35 applies only to care related to controlled substance "abuse," not care related to mere intoxication or influence, which can and does occur even without abuse. The Plaintiff's injuries were not the result of being under the influence of Fentanyl, but rather of her reaction to the drug being introduced into her system in an altered form by a non-approved method of delivery and for purposes not intended, which is abuse. The undisputed facts in the record before the Court support the conclusion that Exclusion No. 35 is not prohibited by Indiana law and that the Exclusion's unambiguous terms apply to the circumstances of this case.

Exclusion No. 42 acts to exclude coverage for treatment of any complications that arose out of the emergency intubation and transportation by EMS to the hospital. The Defendant has satisfied its burden to establish, as a matter of law, that it is not required to reimburse the Plaintiff for the medical expenses she incurred in connection with her abuse of Fentanyl, and the

15

Plaintiff cannot recover on her claims for reimbursement, prejudgment interest, attorney's fees, and other costs.[5]

**B.      Attorney's Fees**

Under ERISA, a court may, in its discretion, award "a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1); *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 818 (7th Cir. 2002). There is a modest, rebuttable presumption that the prevailing party in an ERISA case is entitled to an award of fees. *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 695–96 (7th Cir. 2005). The Seventh Circuit has recognized two tests for analyzing whether attorney's fees should be awarded to the prevailing party in an ERISA case. The first test looks at five factors: (1) the degree of the offending party's culpability or bad faith; (2) the degree of the offending party's ability to satisfy an award of attorney's fees; (3) the degree to which such an award would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on all the plan members; and (5) the relative merits of the parties' positions. The second test looks to whether the losing party's position was "substantially justified." *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998); *see also Fritcher*, 301 F.3d at 819. A losing party's position is substantially justified if it is more than non-frivolous, even though less than meritorious. *Herman*, 423 F.3d at 696.

The Defendant argues that it is entitled to recover attorney's fees and costs as the prevailing party because it acted properly when it denied the Plaintiff's claims and because the

---

[5] Because other exclusions apply to justify denial of coverage, it is not necessary for the Court to resolve the parties' dispute regarding the application of Exclusion No. 45. The same is true of Exclusion No. 36 related to intentionally self-inflicted injuries.

Plaintiff continued to pursue preempted state claims and unavailable remedies after the Defendant advised the Plaintiff that the only claims available to her were those under ERISA. The Court does not agree that these factors support an award of attorney's fees for the Defendant. First, although the Defendant properly denied the Plaintiff's claims, she was substantially justified in believing that Indiana law barred certain Policy language, and she acted in accordance with her good faith belief. The Plaintiff's arguments were well reasoned and "more than non-frivolous." Second, the Plaintiff's continued assertion of state law claims in her Amended Complaint did not significantly add to the litigation burden as the claims essentially required the same discovery and burdens of proof as the ERISA claims. There is no evidence that the Plaintiff acted in bad faith, that she has the ability to satisfy an award of fees, or that such an award would deter similar claims, and the Court, in its discretion, declines to award attorney's fees to the Defendant.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Partial Summary Judgment [ECF No. 15] is DENIED and the Defendant's Motion for Summary Judgment is GRANTED [ECF No. 17]. The Defendant's request for an award of attorney's fees [ECF No. 17] is DENIED. Judgment will be entered in favor of the Defendant and against the Plaintiff.

SO ORDERED on January 7, 2011.

                                                     s/ Theresa L. Springmann
                                                     THERESA L. SPRINGMANN
                                                     UNITED STATES DISTRICT COURT
                                                     FORT WAYNE DIVISION